Good morning. May it please the court, Ken Craig from Texas, here representing the appellants. The key issue being that the plaintiff appellants were denied the right to a 17A substitution and allowing the proper party to be substituted and proceed with the case. Is that the issue, counsel? That's what the issue had to do with sanctions. There are two different ones. The case has been dismissed and you've been sanctioned. There were two different ones. The initial one, the hearing, which the judgment was on the 6th of June, that one was related to not being able to substitute. The second is in sanctions. And in the sanctions, all of this pivoted around a set of circumstances. Facts that the plaintiff put forward and his layer of facts, and then the Irish barrister, Walker, came back and presented the facts in the light that he saw versus what was filed with the CRO. The court determined that the party seeking to be added was a sham plaintiff. That's why it was disallowed. So why did the court err in making that determination? Are you saying that the court was not entitled to rely on the testimony from the Irish barrister? I'm saying that the court relied on the testimony and it turned out that the testimony that the Irish barrister gave was improper. Why? Because the Irish barrister stated specifically that there was no capacity for EOBi at that point in time to file the lawsuit. Connor Finley, the CEO, went back and tried to modify because he had purchased the company, Laricon, in 2008. At the time that he did the purchase, he gave them information and asked the company, the research company, to go ahead and file and change the name. But the court made specific findings that those purported foulings were made in bad faith. Now, why were the factual findings made by the court clearly erroneous? Because in the judge's order, first it was specifically fraudulent. This document is fraudulent. And the documents that they say were fraudulent were prepared not by Finley but by a company set up. And the document was supposedly fraudulent because it had been backdated. But the filing wasn't backdated. The filing was made in 2014 with an effective date. But you made all those arguments to the district court. Correct. Why should we second guess the district court's decision when the district court heard all the evidence, was able to assess the credibility of the people who testified? Why should we overturn that? Because in 2015 later, which the investigation continued because of the issue that they couldn't understand why the filings for Indy Zone or for Ventures, EOBi Ventures, couldn't be found. Because they knew the 2008 filing they didn't know specifically about. But the 2014 filing, they knew that they had just filed. And the barrister came back and said, they have never filed. They didn't file in 2014. And they didn't file in 2008. And if they did, it would be in the public records. But what happened in 2015 after? The decision before us on sanctions is dated September 2, 2014. Correct. So what you're talking about is something that happened later. What happened was Mr. Dollinger went to Ireland, met with the CRO people, and found out that there is a system whereby these applications for name, when a new name application comes in, the old one is purged. You're talking about this is something that Mr. Dollinger did in 2015? Correct. Did he go back to the district court? That's what he went back to with the 62-1 motion. That was the Rule 59. Okay. And when he found that out, he also went further and found out that not only is it purged, but he can go back and get that document through metadata. And they did. They went back and got the document and showed that it was actually filed as they said it was filed and not, you know. But I think Judge Shabria, that was presented to him under a theory of either new evidence or fraud. And he found that it was neither. Right? And how does it change the outcome of the case? How was it new evidence? Why did he abuse his discretion in ruling otherwise? Because there were several different instances there. And it was a series of facts. First, they said that there was no, that there was a board meeting to dissolve the company. And in the meeting, they voted to dissolve the company. Then, but instead of dissolving the company affirmatively, they allowed it to be dissolved the following year administratively from the CRO. The court pointed to that and said that that was an issue that where they tried to show fraud, that they had a duty to. And that is not true. You can vote and it isn't really in conflict to then allow it to be dissolved instead of affirmatively dissolving it. And then they said, then the next point the court relied on was that the fraudulent backdated filings. But the filings weren't fraudulently backdated. The filings were 2014 with an effective date of 2008. The filings weren't prepared by Connor Finley. The filings were prepared by Company Setup, which is in the business of doing that. So you would be saying that the company that does that all the time is fraudulently acting with the plaintiff. And they said that they were creating a sham corporation with EOBi license because they hadn't filed EOBi license. And it had just been filed in 2014 in an effort to create a new plaintiff. And the truth of the matter is EOBi license was filed to correct what hadn't been done with EOBi Ventures. All of these things were a series of mishaps administratively that should have been corrected. And the court disallowed the opportunity to correct it based on the fact that the Irish barrister specifically gave them more and more details stating that this couldn't be done under Irish law. And the court accepted what the barrister said. In 2015, when they went into and got into more detail, they found that even though it had been stated affirmatively, even the Irish barrister came back in his September declaration post-judgment stating that EOBi license did have standing and capacity to sue and that he had stated an error. Their position then was that EOBi licensing, even though it had the capacity to sue, there were so many other things that it was implausible that anything could have possibly done, fallen in this line of sequence of events. So where does the Irish barrister say he was in error in everything he said before? In his declaration September 24th. He doesn't say he's in everything, but he does admit that the CRO does purge those records and that EOBi licensing did have the capacity to sue. Counsel, the EOBi licensing registration with the CRO was one of the documents that the district court found to be fraudulent. Correct. Based on evidence from Barrister Walker, pointed to the bar code, pointed to certain dates that were inconsistent, and so on, which indicated that it had to be done much later in 2014. That's correct. Is there any place in Mr. Fennelly's declaration where he acknowledged that it hadn't been done in 2008 and it was actually done in 2014? Yes, it is. It's in there. Where is it? It's in his supplemental declaration? It's in the supplemental declaration. Okay. I have it open. I'm looking at it. Which paragraph is it? I have to go back and look. What I have is paragraph 4. The company is officially named EOBi Licensing Ltd. and was registered under its former name in July 15, 2018. He just made the statement that it had been registered in 2008. Right. He's just had all kinds of trouble. Fennelly's had all kinds of trouble with the district court, and the district court is all over him. And he makes the statement that it was, I suppose, I think the word in is supposed to be on. On. But it wasn't registered on July 15. It may have been effective then, but it was certainly filed. But the registration was prepared by Company Setup. Whose Company Setup? Company Setup is the company that took over the Laricon EOBi Venture filings. This is an outside consultant? Right. The private research. They are a company that does corporate filings in Iowa. And did they make up the date on their own? No. The date was there, but the date on the filing showed that it was, that the effective date, not the date of the filing, but the effective date was 2008, to correct the error of non-filing because the name change was rejected in 2008 originally, which Mr. Fennelly was not aware of when that was initially taken over from Laricon. When did he become aware? In 2013. And when did the judge offer him the opportunity, and not only offer him the opportunity, but direct him to show up for the evidentiary hearing and testify which invitation or direction he ignored? August 6th. He was ordered to appear in the August 6th hearing, which was after it was already dismissed in the June 5th, from the June 5th hearing, the June 6th declaration. The case wasn't dismissed. The sanctions... The case, the sanctions were... Wait a minute. The sanctions were imposed... He was ordered to appear. Right. For the sanctions... Your clients were given an extension of time in order to get him there. And he was ordered to appear, and Mr. Dollinger showed up without Mr. Fennelly and told the judge that he didn't realize that Mr. Fennelly was ordered to appear, and told the judge that he was unaware of any written order directing him to appear. And none of that was true. But that was not after the case was dismissed with prejudice? The case was dismissed with prejudice on June 6th. And then the sanctions hearing was August 6th. Okay. Well... They had dismissed the case against all defendants on June 6th. And the order was for the sanctions hearing. One of the sanctions was dismissal. There were two sanctions. One was attorneys... One were fees and costs connected with the sanctions litigation, and the other was dismissal with prejudice. That was as a sanction for the misconduct. But the ruling... Which effectively dismissed the cases. Then August 6th was the official. And on the judgment, September 2nd, she went through that entire litany of circumstances related back to the fraud. And what the frustration of the plaintiff was that all that time, the plaintiff was trying to continue to show that this sequence of events actually happened. And she was saying it had to be fraud. It had to be fraud because, well, the plaintiff couldn't say, listen, I want to bring EOBi Limited back, which he had every right to do. Just reinstate EOBi Limited. Then he wouldn't have to go through all the proof of these other issues. However, he knew that in the 20,000 e-mails that had been taken and the ancillary files that had been taken by the defendants, there were files in there and e-mails that talked about several things, including, one, the purchase of Larikon, two, the transfer of the intellectual property to Amdex, and three, the name change to EOBi Ventures. So if he had come in and said, okay, no, I want to just bring EOBi back, they had the right to do this, then he knew that he was going to have an issue that the defendants could take the information that they had stolen from the company and come back to use it to prove that he was acting improperly. Why did he buy Larikon? Why didn't he just establish a new company? In retrospect, he probably should have. But Larikon was available. There was a company called Private Research. Larikon being available, I mean, this was just a name that was available. Then he was going to change the name. It just seemed like an awful lot of work to do as well. He was working with a company called Private Research, which was a registration and company that did the registration and filings with the CRO. It looks like he bought Larikon later on just because he needed the data on which it was incorporated. That's what the court ruled. The question is, is that a fact? And you have to go to the depositions or go to the discovery to be able to present your case there. Is there any plausible explanation for why he would buy a taxi company in order to lodge a billion dollars' worth of intellectual property? My understanding is that there was a connection between he and the Burns of some kind. Is it of no consequence to the CRO in Ireland that the document changing the company name or changing the director or secretary details on Larikon was backdated? Does the CRO not care? The date on which Mr. Fennelly signed this is listed as July of 2008. He could not have signed that on July of 2008. Okay, so that is not correct. It wasn't signed as of that date. That's right. It was signed in 2014. Correct. Okay. And is it of no consequence to the CRO doesn't care that you're filing a document that says, I signed this on, this is true as of July of 2008, and you didn't actually sign it in July of 2008? I understand that there might be reasons for saying we're correcting an error and we're signing this document now and we're telling you that we did this in 2008 and we're doing this to correct it. Then everybody's square. And that's what he was intending to do. He intended to do that with the CRO or he intended to do that with the district court or both? He intended to do that with the CRO. His intention was not to backdate a document. Okay, but is it of no consequence to the CRO that he did it in this way? He's defrauded the CRO. From my perspective, it looks like he's defrauding the CRO as well. Well, Company Setup was the one who prepared the documents. I got that Company Setup prepared the documents, but Company Setup knows better. He signed it. Mr. Fennelly signed it and dated it. Company Setup didn't sign it and date it. And then Mr. Dullinger presented this to the court as evidence that it had been done in 2008, and it wasn't. No. Okay, I don't understand that he presented it as being done in 2008. It was always being done in 2014 to correct the error from 2008. No, it was never presented that way to the district court, was it? That's the way that I read it. Because all of these facts were basically put aside as totally implausible and a sham. But the truth is they can be basically reconciled with what the barrister said, other than the fact that he specifically, and I need to save a little bit of time for rebuttal, but he specifically said that this court had or the EOBI had no capacity to sue. And that was what basically the court ruled on. He said there was no capacity. But then later in 14th or in 24th of September in his declaration, he recanted and said, yes, they do have the capacity to sue. Could I save a little bit of time for rebuttal? Of course. Thank you. May it please the court. My name is Keiko Sugisaka, and I am counsel for each of the 13 individual defendants, appellees in this case, the three jingan entities, and Music.me. I will be arguing today on behalf of all of the appellee defendants in this case. And, your honors, I respectfully submit to not second guess the district court's findings and decisions in this case. Judge Chabria presided over very lengthy proceedings, including multiple rounds of briefing and a full evidentiary hearing to come to the conclusion that fraud had occurred in this case on the court and to the parties. And the extensive record in this case, which is set forth fully in our briefing, reveals this very, for lack of a better word, remarkable and brazen fraud on the court by the appellants and their principal, Connor Fennelly, and aided by their attorney, Mr. Dollinger. What they did is they fabricated a plaintiff to add to the case after learning that the original plaintiff, EOBi Limited, the owner of the underlying IP that was at issue in the case, had been dissolved since 2008 and lacked capacity to sue. And I think you need to look at some of these statements that counsel talked about in context in terms of there's nothing wrong with letting a board vote to dissolve a company, because the context is this is the story that the appellants pitched to the district court, is that EOBi Limited, an Irish company, had software technology that was worth over a billion dollars. However, the board voted to allow the company to administratively dissolve and be struck off the register by the Irish company's registration office. But before that dissolution took place in April of 2008, it transferred all the rights to this very value IP technology to a supposed holding company in Singapore called Amdex PTE, who then held it just long enough until a taxi company was incorporated in Ireland on July 15th of 2008, and then the holding company transferred this very valuable IP technology into that taxi company, who was really the proper plaintiff in this lawsuit and had been operating as EOBi since 2008. That's their story. And even if one could think that this is remotely plausible, what happened at the district court is the appellants provided no evidence whatsoever to confirm any part of this story, and instead submitted false and misleading declarations and documents to the district court in order to advance this story that they had. But as you can tell from the record, there was a very thorough investigation by appellees. We did have to employ the services of an Irish barrister in Ireland because of the foreign nature of these documents and filings to attest to what he found. And what was shown in the record is that there was absolutely no evidence that EOBi Limited's board voted to allow it to administratively dissolve at any time. Instead, the record showed that it was actually the Irish CRO that took the action to strike the company off their register for failure to file annual returns for three years. There was no evidence that EOBi Limited ever transferred out any IP rights, if it even had any, that were the subject of this lawsuit. There was no evidence of this alleged holding company, Amdex PTE, who was the alleged recipient of the IP rights after EOBi Limited dissolved and before the taxi company was incorporated. But instead, the unrebutted evidence in this case showed that Connor Fennelly created a proposed plaintiff, EOBi Licensing Limited, in February of 2014. So after the lawsuit was filed, after appellees brought a motion to dismiss EOBi Limited, because it had dissolved almost six years earlier in 2008 and couldn't sue, and he created this plaintiff from an existing but dormant taxi company, Laragon Chauffeur Drive, which Mr. Fennelly then claimed had received the EOBi Limited IP rights and had been doing business as EOBi since 2008. From your perspective, Fennelly creates EOBi Licensing, sort of renames Laragon, and the reason that he acquired Laragon was because it had a convenient date of incorporation? Absolutely, Your Honor. That is what our argument was at the district court. We believe that that is what the evidence showed. That is what Judge Chabria also found as part of his order in ordering sanctions and dismissal. We are hearing here at this hearing for the first time that all of this, these filings that Mr. Fennelly conducted in February of 2014 to create Laragon, or excuse me, to create EOBi Licensing from the taxi company Laragon, is actually not Mr. Fennelly's fault. It's actually this company's setup. There was no evidence provided at the district court as to companies set up actually preparing these documents that were filed in February of 2014 or submitting them. Everything that was submitted and found at the district court were supposedly prepared by Mr. Fennelly, had Mr. Fennelly's signature on all of them, and at the evidentiary hearing, Mr. Dollinger also tried to argue that these were documents, these documents that were backdated, and their effective dates were made to July of 2008, saying that EOBi Licensing, you know, had existed at that time, but just happened to be a taxi company back then. You know, those were all filings that were, you know, that were done by Mr. Fennelly. And they made two arguments, actually, at the evidentiary. One is that these documents, the documents that had the signatures on them from Mr. Fennelly from July 2008 had actually been signed in July of 2008. That was easily disproven at the evidentiary hearing based on the barcode technology, based on the reference to laws of 2013 that are on the forms. And then Mr. Dollinger alternately argued that, well, you know, even if these were signed now, what he's really trying to do now is just to fix the fact that these filings hadn't been done properly in 2008. But as the evidence at the hearing showed, that was incorrect. Mr. Barrister Walker testified, and Judge Chabria found in his findings that this was not the method to fix mistakes of past filings with the Irish Companies Registration Office. He wasn't correcting anything in the past. He was creating a new company in February of 2014, and the evidence was clear that this taxi company that had been incorporated in July of 2008 had absolutely no relationship to the proposed plan by Licensing Limited. It had been, that taxi company had been filing annual returns with the company's registration office since its incorporation in 2008 until Mr. Fennelly took it over in 2014. And every single one of those filings every year showed that it was always a taxi company. It was a company named Larry Concho for a Drive. It had a business purpose of being a taxi company. It had no employees. It had no business. And it had no assets. So all of this was completely contrary to the representations made by appellants that the taxi company really was the same entity as EOBi Licensing since 2008, and that these filings were happening in 2014. We're simply fixing that fact. Your opponent over here said something about in 2015 or in connection with the Rule 60B motion, the Irish Barrister, Mr. Walker, who had previously said EOBi or EOBi Licensing had no capacity to sue, changed his mind. What's that all about? Frankly, Your Honor, I'm not sure, because the fact of the matter is EOBi Licensing, or well, EOBi Limiting, EOBi Limited, which was the original plan of the case, since it was dissolved, lacked capacity to sue under Irish law. And if it can't sue under Irish law, then it can't sue in a lawsuit in the United States. So I'm not sure what that is. I think it's a matter of whether or not it can sue under Irish law. I can explain to you, to the extent it's not clear from our briefing, about the July 2015 investigation. That's the basis for appellants' Rule 60 motion for relief from judgment. So even though the entire underlying case and proceedings were centered around this purported plaintiff, proper party in the case, based on what we were finding in the company's registration records, the series of events went like this. Conner Fennelly first made a declaration, after we pointed out, EOBi Limited dissolved, can't sue, should be out of the case. Then appellants brought a motion to amend to say, oh, and this was a declaration by Mr. Fennelly that said, well, for God, it's actually not, we know EOBi Limited dissolved. The board voted to do that back in 2008. And the company is actually called EOBi Ventures. And the board voted to do that back in 2008. And that's the proper plaintiff that should be in the case. So here's your amended complaint that we just replaced all the names for EOBi Limited with EOBi Ventures. And this was amendment under Rule 15. And when we had Barrister Walker check the filings with the Irish CRO, he did not find any company named EOBi Ventures that was registered. We point that out. So then, instead of replying to the motion to amend, withdrawing it, they file a motion that says, okay, I forgot, I forgot, you know, had done this. But he was saying that some point later, after Judge Chabrier's September 2014 opinion, I assumed he was saying in connection with the Rule 60B motion, that your barrister, Mr. Walker, said something differently about capacity to sue than he had ever said before. And I'm not sure what declaration he's referring to or whether you could tell us what Mr. Walker said or didn't say at that time. Yeah, it wasn't, Your Honor, it was not capacity to sue. I believe what appellants are referring to is whether or not that name change, alleged name change to change the taxi company's name to EOBi Ventures, would show up in the publicly available filings for the company on the CRO's website. So what happened is Barrister Walker, at our evidentiary hearing as part of our motion for sanctions, is looking at the filings for the CRO, for this taxi company, to see whether or not that name change does not see a rejected name change request from 2008 or any time for a request to have the taxi company's name changed to EOBi Ventures, who says they didn't do it. And so what we did find, though, is a name change in February 2014 to change the taxi company's name to EOBi Licensing. So the fact, Judge Chabria, as one, just one of several bases of, you know, finding misrepresentations, said Fennelly lied about changing the taxi company's name to EOBi Ventures because we don't see a name change request for that, and they claim it was rejected and he forgot about it since it was back in 2008, and there's no name change rejection reflected in the filings, because Barrister Walker said that would be reflected on those filings you see in the website. So what happened in July 2015, according to plaintiffs, is that they went to Ireland, they hired a solicitor to ask the CRO to investigate this supposed name change filing to EOBi Ventures, and what they did is they got the, according to these e-mails and affidavits, the CRO had to get their IT analysts to go into the metadata in their computer system to find the name change request, to look into the filings for the taxi company, and at that point they found a name change request that Mr. Fennelly had submitted in February of 2014 to change the taxi company's name to EOBi Ventures, and it had been rejected. And then he resubmitted the name change request, but this time it was for EOBi Licensing. So they pointed that out as a basis. It was both, I believe, they raised it in the email, and the CRO said, well, you know, there's a motion for reconsideration in Rule 59, which they are not appealing, but then the actual investigation to the computer metadata happened in July of 2015. That's the basis for their Rule 60 motion, relief from judgment. And, Your Honors, that is not a basis for Rule 60 motion for relief from judgment. The evidence in this case does not show that this was simply a series of mishaps by Mr. Fennelly or the appellant. As counsel would like to characterize, this was deliberate deception on the court in trying to create a sham plaintiff, and to save this case. And to that end, Judge Chabria properly exercised his discretion in entering terminating sanctions for this bad faith conduct. And it is very clear in the record that the appellants had every opportunity to defend against the sanctions motion. They had noticed that terminating sanctions would be imposed, and the appellants had every opportunity to defend against the sanctions motion. And they didn't defend this case. They did not have Mr. Fennelly show up at the evidentiary hearing as ordered, and they provided no witnesses or documents in their defense. And so, Your Honor, that is something we believe should be upheld. I want to just speak very briefly on the fees issue. Judge Chabria awarded fees to the appellees that were encouraged to pursue sanctions. And I would like to just submit to Your Honors that doing so was proper under either Section 1927 sanctions, which, you know, award fees against attorneys for vexatious, unreasonable conduct to multiply proceedings. And in our briefing, we cited the Norellis case from the Eleventh Circuit that acknowledges that you can recover fees for 1927 sanctions that are incurred to pursue those sanctions. And this Court agreed with Norellis in an opinion earlier this year, in April, the Blixeth v. Yellowstone Mountain Club case, 854 F. 3rd. 626. So it's essentially the same standard. But also, that's only going to reach Mr. Dollinger. The inherent sanctions fees award in this case should also include fees incurred to pursue the sanctions motion. This is consistent with Chambers v. NASCO, because the sanctionable conduct in this case was pervasive. It permeated the case. It went to a central issue as to whether or not there was a viable plaintiff. So it's not a limited, you know, discovery dispute or something like that, where you might want to bring a sanctions motion. You're going to be limited to, you're not going to get fees for pursuing that. Here we have, like in the Chambers case, a compensatory causal relationship between the fees sought and the fees awarded, which included pursuing the sanctions. And in Chambers, there was quite a large amount of fees in that case. It was, the award was nearly a million dollars. It covered actually all the fees incurred in that case, including moving for this evidentiary hearing. And the basis for that is that literally everything that the defendant did, the sanctioned party did in Chambers, was designed to frustrate this viable claim that was being brought and to, and it permeated throughout the case. It's very similar to the situation we have here, because we have a plaintiff now instead of a defendant. And the plaintiff here is engaged in deception to keep the lawsuit alive with a viable plaintiff. Whereas if it didn't, then this supposed IP rights holder, you know, would be dismissed for lack of capacity to sue. Your Honors, if there are no further questions, I would simply ask that the Court affirm the District Court. Thank you, Counsel. Thank you. In the filings for Laracon, they were filed each year by company setup, the same way that the filings for EOBI Ventures were in EOBI licensing. The one thing that we do know, we don't know if the owner signed the documents, but we know that the Secretary, Teresa, did not sign the documents, even though they were signed and submitted. So we don't know if they were signed by somebody at company setup or somebody signed a name for it. But obviously, when every other year her name was signed with an H in it, and the other years it was signed without an H, it wasn't her signature. So these things may have been normally done within the company and filed by company setup for their customers. All they know is they were getting paid. And when the judge went through, she said specific, or the Court said specifically, EOBI Limited Board of Directors, as she said, voted to dissolve. And then there was a list that was put in there in the evidence of some 400 names that were dissolved, as he called a strike off, which we consider here in the States as an administrative dissolution for nonpayment or nonpayment. So it was a non-filing of annual returns. The judge relied on that being specific, that those things were required to be done, and they weren't. And because they weren't, she ruled for them. All right. Thank you, counsel. Thank you to both counsel for your argument. That completes our calendar for the morning. We are on recess until 9 a.m. tomorrow morning.
judges: Rawlinson, Bybee, Friedman